(Slip Opinion) OCTOBER TERM, 2019 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## KANSAS *v.* GARCIA

### CERTIORARI TO THE SUPREME COURT OF KANSAS

No. 17–834. Argued October 16, 2019—Decided March 3, 2020*

The Immigration Reform and Control Act of 1986 (IRCA) makes it unlawful to hire an alien knowing that he or she is unauthorized to work in the United States. 8 U. S. C. §§1324a(a)(1), (h)(3). IRCA requires employers to comply with a federal employment verification system. §1324a(b). Using a federal work-authorization form (I–9), they "must attest" that they have "verified" that any new employee, regardless of citizenship or nationality, "is not an unauthorized alien" by examining approved documents, *e.g.,* a United States passport or an alien registration card, §1324a(b)(1)(A). IRCA concomitantly requires all employees to complete an I–9 by their first day of employment and to attest that they are authorized to work. §1324a(b)(2). Every employee must also provide certain personal information, including name, address, birth date, Social Security number, e-mail address, and telephone number. It is a federal crime for an employee to provide false information on an I–9 or to use fraudulent documents to show work authorization. See 18 U. S. C. §§1028, 1546. But it is not a federal crime for an alien to work without authorization, and state laws criminalizing such conduct are preempted. *Arizona* v. *United States*, 567 U. S. 387, 403–407. The I–9 forms and appended documentation, as well as the employment verification system, may only be used for enforcement of the Immigration and Nationality Act or other specified federal prohibitions. See §§1324a(b)(5), (d)(2)(F). IRCA does not directly address the use of an employee's federal and state tax-withholding forms, the W–4 and K–4 respectively. Finally, IRCA expressly "preempt[s] any State or local law imposing civil or criminal sanctions

_____

*Together with *Kansas* v. *Morales* (see this Court's Rule 12.4) and *Kansas* v. *Ochoa-Lara* (see this Court's Rule 12.4), also on certiorari to the same court.

Syllabus

. . . upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." §1324a(h)(2).

Kansas makes it a crime to commit "identity theft" or engage in fraud to obtain a benefit. Respondents, three unauthorized aliens, were tried for fraudulently using another person's Social Security number on the W–4's and K–4's that they submitted upon obtaining employment. They had used the same Social Security numbers on their I–9 forms. Respondents were convicted, and the Kansas Court of Appeals affirmed. A divided Kansas Supreme Court reversed, concluding that §1324a(b)(5) expressly prohibits a State from using *any* information contained within an I–9 as the basis for a state law identity theft prosecution of an alien who uses another's Social Security information in an I–9. The court deemed irrelevant the fact that this information was also included in the W–4 and K–4. One justice concurred based on implied preemption.

*Held*:

1. The Kansas statutes under which respondents were convicted are not expressly preempted. IRCA's express preemption provision applies only to *employers* and those who recruit or refer prospective employees and is thus plainly inapplicable. The Kansas Supreme Court instead relied on §1324a(b)(5), which broadly restricts *any use* of an I–9, information "contained in" an I–9, and any documents appended to an I–9, reasoning that respondents' W–4's and K–4's used the same false Social Security numbers contained in their I–9's. The theory that no information placed on an I–9 could ever be used by any entity or person for any reason—other than the handful of federal statutes mentioned in §1324a(b)(5)—is contrary to standard English usage. A tangible object can be "contained in" only one place at any point in time, but information may be "contained in" many different places. The mere fact that an I–9 contains an item of information, such as a name or address, does not mean that information "contained in" the I–9 is used whenever that name or address is used elsewhere. Nothing in §1324a(b)(5)'s text supports the Kansas Supreme Court's limiting interpretation to prosecuting aliens for using a false identity to establish "employment eligibility." And respondents' express preemption argument cannot be saved by §1324a(d)(2)(F), which prohibits use of the federal employment verification system "for law enforcement purposes other than" enforcement of IRCA and the same handful of federal statutes mentioned in §1324a(b)(5). This argument fails because it rests on a misunderstanding of the meaning of the federal "employment verification system." The sole function of that system is to establish that an employee is not barred from working in this country. The completion of tax-withholding documents plays no part in the process of determining whether a person is authorized to work. Pp. 10–14.

2. Respondents' argument that Kansas's laws are preempted by implication is also rejected. Pp. 15–20.

(a) The laws do not fall into a field that is implicitly reserved exclusively for federal regulation, including respondents' claimed field of "fraud on the federal verification system." The submission of tax-withholding forms is neither part of, nor "related" to, the verification system. Employees may complete their W–4's, K–4's, and I–9's at roughly the same time, but IRCA plainly does not foreclose all state regulation of information required as a precondition of employment. In arguing that the State's statutes require proof that the accused engaged in the prohibited conduct for the purpose of getting a "benefit," respondents conflate the benefit that results from complying with the federal employment verification system with the benefit of actually getting a job. Submitting W–4's and K–4's helped respondents get jobs, but it did not assist them in showing that they were authorized to work in this country. Federal law does not create a comprehensive and unified system regarding the information that a State may require employees to provide. Pp. 15–17.

(b) There is likewise no ground for holding that the Kansas statutes at issue conflict with federal law. It is certainly possible to comply with both IRCA and the Kansas statutes, and respondents do not suggest otherwise. They instead maintain that the Kansas statutes, as applied in their prosecutions, stand as "an obstacle to the accomplishment and execution of the full purposes" of IRCA—one of which is purportedly that the initiation of any legal action against an unauthorized alien for using a false identity in applying for employment should rest exclusively within the prosecutorial discretion of federal authorities. Respondents analogize their case to *Arizona* v. *United States*, 567 U. S., at 404–407, where the Court concluded that a state law making it a crime for an unauthorized alien to obtain employment conflicted with IRCA, which does not criminalize that conduct. But here, Congress made no decision that an unauthorized alien who uses a false identity on tax-withholding forms should not face criminal prosecution, and it has made using fraudulent information on a W–4 a federal crime. Moreover, in the present cases, there is certainly no suggestion that the Kansas prosecutions frustrated any federal interests. Federal authorities played a role in all three cases, and the Federal Government fully supports Kansas's position in this Court. In the end, however, the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to "the Laws of the United States," not the criminal law enforcement priorities or preferences of federal officers. Art. VI, cl. 2. Pp. 18–20.

306 Kan. 1113, 401 P. 3d 588 (first judgment); 306 Kan. 1100, 401 P. 3d

Syllabus

155 (second judgment); and 306 Kan. 1107, 401 P. 3d 159 (third judgment), reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, and KAVANAUGH, JJ., joined.  THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined.  BREYER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–834

KANSAS, PETITIONER
*v.*
RAMIRO GARCIA

KANSAS, PETITIONER
*v.*
DONALDO MORALES

KANSAS, PETITIONER
*v.*
GUADALUPE OCHOA-LARA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[March 3, 2020]

JUSTICE ALITO delivered the opinion of the Court.

Kansas law makes it a crime to commit "identity theft" or engage in fraud to obtain a benefit. Respondents—three aliens who are not authorized to work in this country—were convicted under these provisions for fraudulently using another person's Social Security number on state and federal tax-withholding forms that they submitted when they obtained employment. The Supreme Court of Kansas held that a provision of the Immigration Reform and Control Act of 1986 (IRCA), 100 Stat. 3359, expressly preempts the Kansas statutes at issue insofar as they provide a basis for these prosecutions. We reject this reading of the provision

in question, as well as respondents' alternative arguments based on implied preemption. We therefore reverse.

## I

## A

The foundation of our laws on immigration and naturalization is the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U. S. C. §1101 *et seq.*, which sets out the "'terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Commerce of United States of America* v. *Whiting*, 563 U. S. 582, 587 (2011). As initially enacted, the INA did not prohibit the employment of illegal aliens, and this Court held that federal law left room for the States to regulate in this field. See *De Canas* v. *Bica*, 424 U. S. 351, 353 (1976).

With the enactment of IRCA, Congress took a different approach. IRCA made it unlawful to hire an alien knowing that he or she is unauthorized to work in the United States. 8 U. S. C. §§1324a(a)(1)(A), (h)(3). To enforce this prohibition, IRCA requires employers to comply with a federal employment verification system. §1324a(b). Using a federal work-authorization form (I–9), employers "must attest" that they have "verified" that an employee "is not an unauthorized alien" by examining approved documents such as a United States passport or alien registration card. §1324a(b)(1)(A); see also §§1324a(b)(1)(B)–(D); 8 CFR §274a.2(a)(2) (2019) (establishing Form I–9). This requirement applies to the hiring of any individual regardless of citizenship or nationality. 8 U. S. C. §1324a(b)(1). Employers who fail to comply may face civil and criminal sanctions. See §§1324a(e)(4), (f); 8 CFR §274a.10. IRCA instructs employers to retain copies of their I–9 forms and allows employers to make copies of the documents submitted by employees to show their authorization to work. 8 U. S. C. §§1324a(b)(3)–(4).

IRCA concomitantly imposes duties on all employees, regardless of citizenship. No later than their first day of employment, all employees must complete an I–9 and attest that they fall into a category of persons who are authorized to work in the United States. §1324a(b)(2); 8 CFR §274a.2(b)(1)(i)(A). In addition, under penalty of perjury, every employee must provide certain personal information—specifically: name, residence address, birth date, Social Security number, e-mail address, and telephone number. It is a federal crime for an employee to provide false information on an I–9 or to use fraudulent documents to show authorization to work. See 18 U. S. C. §§1028, 1546. Federal law does not make it a crime for an alien to work without authorization, and this Court has held that state laws criminalizing such conduct are preempted. *Arizona* v. *United States*, 567 U. S. 387, 403–407 (2012). But if an alien works illegally, the alien's immigration status may be adversely affected. See 8 U. S. C. §§1255(c)(2), (8), 1227(a)(1)(C)(i).

While IRCA imposes these requirements on employers and employees, it also limits the use of I–9 forms. A provision entitled "Limitation on use of attestation form," §1324a(b)(5), provides that I–9 forms and "any information contained in or appended to such form[s] may not be used for purposes other than for enforcement of" the INA or other specified provisions of federal law, including those prohibiting the making of a false statement in a federal matter (18 U. S. C. §1001), identity theft (§1028), immigration-document fraud (§1546), and perjury (§1621). In addition, 8 U. S. C. §1324a(d)(2)(F) prohibits use of "the employment verification system" "for law enforcement purposes," apart from the enforcement of the aforementioned federal statutes.

Although IRCA expressly regulates the use of I–9's and documents appended to that form, no provision of IRCA directly addresses the use of other documents, such as federal

and state tax-withholding forms, that an employee may complete upon beginning a new job. A federal regulation provides that all employees must furnish their employers with a signed withholding exemption certificate when they start a new job, but federal law apparently does not require the discharge of an employee who fails to do so. See 26 CFR §§31.3402(f)(2)–1, (5)–1 (2019). Instead, the regulation provides that if an employee fails to provide a signed W–4, the employer must treat the employee "as a single person claiming no exemptions." §31.3402(f)(2)–1(a). The submission of a fraudulent W–4, however, is a federal crime. 26 U. S. C. §7205.

Kansas uses a tax-withholding form (K–4) that is similar to the federal form. Kan. Stat. Ann. §79–3298 (2018 Cum. Supp.); Kansas Dept. of Revenue, Notice 07–07: New K–4 Form for State Withholding (Sept. 5, 2007), www.ortho don.com/home/document/KS-WithholdingForm.pdf; Kansas Dept. of Revenue, Kansas Withholding Form K–4, www.ks revenue.org/k4info.html. Employees must attest to the veracity of the information under penalty of perjury. Form K–4, Kansas Employee's Withholding Allowance Certificate (rev. Nov. 2018), www.ksrevenue.org/pdf/k-4.pdf; Kan. Stat. Ann. §21–5903; see also Kansas Dept. of Revenue, Tax Fraud Enforcement, www.ksrevenue.org/taxfraud.html.

Finally, IRCA contains a provision that expressly "preempt[s] any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) *upon those who employ, or recruit or refer for a fee for employment,* unauthorized aliens." 8 U. S. C. §1324a(h)(2) (emphasis added). This provision makes no mention of state or local laws that impose criminal or civil sanctions on employees or applicants for employment. See *ibid.*

B

Like other States, Kansas has laws against fraud, forgeries, and identity theft. These statutes apply to citizens and

aliens alike and are not limited to conduct that occurs in connection with employment. The Kansas identity-theft statute criminalizes the "using" of any "personal identifying information" belonging to another person with the intent to "[d]efraud that person, or anyone else, in order to receive any benefit." Kan. Stat. Ann. §21–6107(a)(1). "[P]ersonal identifying information" includes, among other things, a person's name, birth date, driver's license number, and Social Security number. §21–6107(e)(2). Kansas courts have interpreted the statute to cover the use of another person's Social Security number to receive the benefits of employment. See *State* v. *Meza*, 38 Kan. App. 2d 245, 247–250, 165 P. 3d 298, 301–302 (2007).

Kansas's false-information statute criminalizes, among other things, "making, generating, distributing or drawing" a "written instrument" with knowledge that it "falsely states or represents some material matter" and "with intent to defraud, obstruct the detection of a theft or felony offense or induce official action." §21–5824.

The respondents in the three cases now before us are aliens who are not authorized to work in this country but nevertheless secured employment by using the identity of other persons on the I–9 forms that they completed when they applied for work. They also used these same false identities when they completed their W–4's and K–4's. All three respondents were convicted under one or both of the Kansas laws just mentioned for fraudulently using another person's Social Security number on tax-withholding forms. We summarize the pertinent facts related to these three prosecutions.

C

*Ramiro Garcia.* In August 2012, a local patrol officer stopped Garcia for speeding and learned that Garcia had been previously contacted by a financial crimes detective about possible identity theft. App. 39–44, 89–91; 306 Kan.

1113, 1114, 401 P. 3d 588, 590 (2017).  Local authorities obtained the documents that Garcia had completed when he began work at a restaurant, and a joint state-federal investigation discovered that Garcia had used another person's Social Security number on his I–9, W–4, and K–4 forms. The State then charged Garcia with identity theft.  The complaint alleged that, when he began work at the restaurant, he used another person's Social Security number with the intent to defraud and in order to receive a benefit.  App. 9–10.

*Donaldo Morales.*  A joint state-federal investigation of Morales began after the Kansas Department of Labor notified a Social Security agent that an employee at a local restaurant was using a Social Security number that did not match the identifying information in the department's files. 306 Kan. 1100, 1101, 401 P. 3d 155, 156 (2017); App. to Pet. for Cert. 73; App. 124–125, 168–170.  A federal agent contacted the restaurant and learned that Morales had used another person's Social Security number on his I–9, W–4, and K–4 forms.  The federal agent arrested Morales, who then admitted that he had bought the Social Security number from someone he met in a park.  App. 171–172; 306 Kan., at 1101–1102, 401 P. 3d, at 156; App. to Pet. for Cert.73.  This information was turned over to state prosecutors, who charged Morales with identity theft and making false information.  App. 124–125; 306 Kan., at 1101, 401 P. 3d, at 156.

*Guadalupe Ochoa-Lara.*  Ochoa-Lara came to the attention of a joint state-federal task force after officers learned that he had used a Social Security number issued to someone else when he leased an apartment.  306 Kan. 1107, 1108–1109, 401 P. 3d 159, 160–161 (2017).  The individual to whom this number was lawfully assigned advised the investigating officers that she had no knowledge that another person was using her number, and she later told authorities

that income that she had not earned had been reported under her number. *Id.,* at 1109, 401 P. 3d, at 160. After contacting the restaurant where Ochoa-Lara worked, investigators determined that he had also used the same Social Security number to complete his I–9 and W–4 forms. *Ibid.* The State charged Ochoa-Lara with identity theft and making false information for using another's Social Security number on those documents.

D

In all three cases, respondents argued before trial that IRCA preempted their prosecutions. They relied on 8 U. S. C. §1324a(b)(5), which, as noted, provides that I–9 forms and "any information contained in or appended to such form[s] may not be used for purposes other than for enforcement of" the INA or other listed federal statutes. In response, the State dismissed the charges that were based on I–9's and agreed not to rely on the I–9's at trial. The State maintained, however, that §1324a(b)(5) did not apply to the respondents' use of false Social Security numbers on the tax-withholding forms.

The trial courts allowed the State to proceed with the charges based on those forms. The State entered the K–4's and W–4's into evidence against Garcia and Morales, and Ochoa-Lara stipulated to using a stolen Social Security number on a W–4. App. 109–110; 306 Kan., at 1108–1109, 401 P. 3d, at 160–161.[1] Respondents were convicted, and

---

[1] In Morales's bench trial, the State also introduced into evidence his I–9 and a photocopy of a permanent resident card and Social Security card that was appended to his I–9. App. 152–154, 178–179. The trial court, however, explicitly assured Morales that it would not make any findings based on the I–9, and defense counsel did not further object to the introduction of the I–9 into evidence. *Id.,* at 150–151. Before the state appellate courts, Morales did not argue that admitting the I–9 and photocopy was error. Nor did his brief in opposition to certiorari argue that the admission of these exhibits provided a ground for relief under federal law. See this Court's Rule 15.2.

three separate panels of the Kansas Court of Appeals affirmed their convictions.

A divided Kansas Supreme Court reversed, concluding that "the plain and unambiguous language of 8 U. S. C. §1324a(b)(5)" expressly prohibits a State from using "any information contained within [an] I–9 as the bas[i]s for a state law identity theft prosecution of an alien who uses another's Social Security information in an I–9." 306 Kan., at 1130–1131, 401 P. 3d at 599 (emphasis deleted). The court added that "[t]he fact that this information was included in the W–4 and K–4 did not alter the fact that it was also part of the I–9." *Id.*, at 1131, 401 P. 3d, at 599. In deciding the appeal on these grounds, the court appears to have embraced the proposition that any fact to which an employee attests in an I–9 is information that is "contained in" the I–9 and is thus subject to the restrictions imposed by §1324a(b)(5), namely, that this fact cannot be used by anyone for any purpose other than the few listed in that provision. Nevertheless, the court suggested that its holding did not sweep this broadly but was instead limited to the prosecution of aliens for using a false identity to establish "employment eligibility." *Id.*, at 1126, 1131, 401 P. 3d, at 596, 600.

Justice Luckert concurred based on implied, not express, preemption. In her view, IRCA occupies "the field" within which the prosecutions at issue fell, namely, "the use of false documents, including those using the identity of others, when an unauthorized alien seeks employment." *Id.* at 1136, 401 P. 3d, at 602. Justice Luckert also opined that the Kansas statutes, as applied in these cases, conflict with IRCA because they "usur[p] federal enforcement discretion" regarding the treatment of aliens who obtain employment even though they are barred from doing so under federal law. *Ibid.*, 401 P. 3d, at 603.

Two members of the court, Justices Biles and Stegall, dissented, and we granted review. 586 U. S. ___ (2019).

II

The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land." Art. VI, cl. 2. The Clause provides "a rule of decision" for determining whether federal or state law applies in a particular situation. *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 324 (2015). If federal law "imposes restrictions or confers rights on private actors" and "a state law confers rights or imposes restrictions that conflict with the federal law," "the federal law takes precedence and the state law is preempted." *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 22).

In all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress. "There is no federal preemption *in vacuo*," without a constitutional text, federal statute, or treaty made under the authority of the United States. *Puerto Rico Dept. of Consumer Affairs* v. *ISLA Petroleum Corp.*, 485 U. S. 495, 503 (1988); see also *Whiting*, 563 U. S., at 599 (preemption cannot be based on "a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'") (citation omitted); *Virginia Uranium, Inc.* v. *Warren*, 587 U. S. \_\_\_, \_\_\_ (2019) (lead opinion of GORSUCH, J.) (slip op., at 3) ("Invoking some brooding federal interest or appealing to a judicial policy preference" does not show preemption).

In some cases, a federal statute may expressly preempt state law. See *Pacific Gas & Elec. Co.* v. *State Energy Resources Conservation and Development Comm'n*, 461 U. S. 190, 203 (1983) ("It is well established that within constitutional limits Congress may preempt state authority by so stating in express terms."). But it has long been established that preemption may also occur by virtue of restrictions or rights that are inferred from statutory law. See, *e.g.*, *Os-*

*born* v. *Bank of United States*, 9 Wheat. 738, 865 (1824) (rejecting argument that a federal exemption from state regulation "not being expressed, ought not to be implied by the Court"). And recent cases have often held state laws to be impliedly preempted. See, *e.g.*, *Arizona* 567 U. S., at 400–408; *Kurns* v. *Railroad Friction Products Corp.*, 565 U. S. 625, 630–631 (2012); *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604, 617–618 (2011).

In these cases, respondents do not contend that the Kansas statutes under which they were convicted are preempted in their entirety. Instead, they argue that these laws must yield only insofar as they apply to an unauthorized alien's use of false documents on forms submitted for the purpose of securing employment. In making this argument, respondents invoke all three categories of preemption identified in our cases. They defend the Kansas Supreme Court's holding that provisions of IRCA expressly bar their prosecutions. And they also argue that the decision below is supported by "field" or "conflict" preemption or some combination of the two. We consider these arguments in turn.

III

We begin with the argument that the state criminal statutes under which respondents were convicted are expressly preempted.

As noted, IRCA contains a provision that expressly preempts state law, but it is plainly inapplicable here. That provision applies only to the imposition of criminal or civil liability on *employers* and those who receive a fee for recruiting or referring prospective employees. 8 U. S. C. §1324a(h)(2). It does not mention state or local laws that impose criminal or civil sanctions on employees or applicants for employment.

The Kansas Supreme Court did not base its holding on this provision but instead turned to §1324a(b)(5), which is far more than a preemption provision. This provision

broadly restricts *any use* of an I–9, information contained
in an I–9, and any documents appended to an I–9. Thus,
unlike a typical preemption provision, it applies not just to
the States but also to the Federal Government and all pri-
vate actors.

The Kansas Supreme Court thought that the prosecu-
tions in these cases ran afoul of this provision because the
charges were based on respondents' use in their W–4's and
K–4's of the same false Social Security numbers that they
also inserted on their I–9's. Taken at face value, this theory
would mean that no information placed on an I–9—
including an employee's name, residence address, date of
birth, telephone number, and e-mail address—could ever be
used by any entity or person for any reason.

This interpretation is flatly contrary to standard English
usage. A tangible object can be "contained in" only one
place at any point in time, but an item of information is dif-
ferent. It may be "contained in" many different places, and
it is not customary to say that a person uses information
that is contained in a particular source unless the person
makes use of that source.

Consider a person's e-mail address, one of the bits of in-
formation that is called for on an I–9. A person's e-mail
address may be "contained in" a great many places. Indi-
viduals often provide their e-mail addresses to a wide circle
of friends, acquaintances, online vendors, work-related con-
tacts, and others. In addition, the records of every recipient
of an e-mail from a particular person will contain that ad-
dress.[2] In ordinary speech, no one would say that a person
who uses an e-mail address has used information that is
contained in all these places.

Suppose that John used his e-mail address five years ago
to purchase a pair of shoes and that the vendor has that

—————————

[2] Of course, a considerate sender may remember to put the addresses
in the BCC line.

address in its files.  Suppose that John now sends an e-mail
to Mary and that Mary sends an e-mail reply.  No one would
say that Mary has used information contained in the files
of the shoe vendor.

Or consider this bit of information: that the first man set
foot on the moon on July 20, 1969.[3]  That fact was reported
in newspapers around the world, from Neil Armstrong's
hometown newspaper, the Wapakoneta (Ohio) Daily News[4]
to the Soviet newspaper Izvestia.[5]  Suppose that an elemen-
tary school student writes a report in which she states that
the first man walked on the moon in 1969.  No one would
say that the student used information contained in the
Wapakoneta Daily News or Izvestia if she never saw those
publications.  But it would be natural to say that the stu-
dent used information contained in a book in the school li-
brary if that is where she got the information for her report.

Accordingly, the mere fact that an I–9 contains an item
of information, such as a name or address, does not mean
that information "contained in" the I–9 is used whenever
that name or address is later employed.

If this were not so, strange consequences would ensue.
Recall that 8 U. S. C. §1324a(b)(5) applies to the Federal

——————

[3] Twentieth Century Almanac 405 (R. Ferrell & J. Bowman eds. 1984);
NASA, The First Person on the Moon (last updated Apr. 9, 2009),
www.nasa.gov/audience/forstudents/k-4/stories/first-person-on-moon.html.

[4] Neil Steps on the Moon, Wapakoneta Daily News, July 21, 1969, p. 1,
https://blogs.loc.gov/headlinesandheroes/2019/08/newspaper-coverage-of
-one-giant-leap-for-mankind.

[5] See The First Steps: Luna Took the Envoys of the Earth, Izvestia,
Moscow Evening ed., Jul. 21, 1969, p. 1 (transl.); NASA, Astronautics
and Aeronautics, 1969: Chronology on Science, Technology, and Policy
233 (NASA SP–4014 1970); see also McFall-Johnsen, Newspaper Front
Pages From 50 Years Ago Reveal How the World Reacted to the Apollo
11 Moon Landing, Business Insider US, July 20, 2019, http://www.busi-
nessinsider.com/apollo-11-moon-landing-newspaper-front-pages-2019-7/.

Government. Under 26 U. S. C. §7205, it is a crime to will-fully supply false information on a W–4, and this provision is not among those listed in 8 U. S. C. §1324a(b)(5). Thus, if an individual provided the same false information on an I–9 and a W–4, the Federal Government could not prosecute this individual under 26 U. S. C. §7205 even if the Government made no use whatsoever of the I–9. And that is just the beginning.

Suppose that an employee truthfully states on his I–9 that his name is Jim Smith. Under the interpretation of 8 U. S. C. §1324a(b)(5) that the Kansas Supreme Court seemingly adopted, no one could use Jim's name for any purpose. If he robbed a bank, prosecutors could not use his name in an indictment. His employer could not cut a paycheck using that name. His sister could not use his name to mail him a birthday card.

The Kansas Supreme Court tried to fend off these consequences by suggesting that its interpretation applied only to the prosecution of aliens for using a false identity to establish "employment eligibility." 306 Kan., at 1126, 401 P. 3d, at 596. But there is no trace of these limitations in the text of §1324a(b)(5). The point need not be belabored any further: The argument that §1324a(b)(5) expressly bars respondents' prosecutions cannot be defended.

Apparently recognizing this, respondents turn to §1324a(d)(2)(F), which prohibits use of the federal employment verification system[6] "for law enforcement purposes other than" enforcement of IRCA and the same handful of federal statutes mentioned in §1324a(b)(5): 18 U. S. C. §1001 (false statements), §1028 (identity theft), §1546 (immigration-document fraud), and §1621 (perjury).

---

[6] This provision refers to "the system," but it is apparent that this means "the employment verification system," which is described in some detail in §1324a(b). There is no other system to which this reference could plausibly refer.

This argument fails because it rests on a misunderstanding of the meaning of the federal "employment verification system."  The sole function of that system is to establish that an employee is not barred from working in this country due to alienage.  As described in §1324a(b), the system includes the steps that an employee must take to establish that he or she is not prohibited from working, the steps that an employer must take to verify the employee's status, and certain related matters—such as the preservation and copying of records that are used to show authorization to work.

The federal employment verification system does not include things that an employee must or may do to satisfy requirements unrelated to work authorization.  And completing tax-withholding documents plays no part in the process of determining whether a person is authorized to work.[7]  Instead, those documents are part of the apparatus used to enforce federal and state income tax laws.[8]

For all these reasons, there is no express preemption in these cases.

_____

[7] Moreover, these documents are not always submitted when an employee begins a job.  Instead, new W–4's and K–4's may be, and often are, completed at later dates when an employee wishes to make changes that affect the amount of withholding.  26 CFR §31.3402(f)(2)-1; IRS, Publication 505: Tax Withholding and Estimated Tax 3 (May 15, 2019) ("During the year, changes may occur . . . .  When this happens, you may need to give your employer a new Form W–4 . . . .  Otherwise, if you want to change your withholding allowances for any reason, you can generally do that whenever you wish"); Kansas Dept. of Revenue, Kansas Withholding Form K–4, www.ksrevenue.org/k4info.html.

[8] Respondents also contend that 18 U. S. C. §1546(c) expressly preempts the relevant Kansas statutes as applied in their prosecutions, but it is impossible to see any basis for that argument in the statutory text.  This subsection, which is part of a provision that criminalizes certain conduct relating to immigration and authorization to work, provides that the section "does not prohibit any lawfully authorized investigative, protective, or intelligence activity" of a federal or state law enforcement agency, a federal intelligence agency, or others engaged in certain activity relating to the prosecution of organized crime.  How this provision can be seen as expressly barring respondents' prosecutions is a mystery.

IV

We therefore proceed to consider respondents' alternative argument that the Kansas laws, as applied, are preempted by implication. This argument, like all preemption arguments, must be grounded "in the text and structure of the statute at issue." *CSX Transp., Inc.* v. *Easterwood,* 507 U. S. 658, 664 (1993).

A

Respondents contend, first, that the Kansas statutes, as applied, fall into a field that is implicitly reserved exclusively for federal regulation. In rare cases, the Court has found that Congress "legislated so comprehensively" in a particular field that it "left no room for supplementary state legislation," *R. J. Reynolds Tobacco Co.* v. *Durham County,* 479 U. S. 130, 140 (1986), but that is certainly not the situation here.

In order to determine whether Congress has implicitly ousted the States from regulating in a particular field, we must first identify the field in which this is said to have occurred. In their merits brief in this Court, respondents' primary submission is that IRCA preempts "the field of fraud on the federal employment verification system," Brief for Respondents 41 (quotation altered), but this argument fails because, as already explained, the submission of tax-withholding forms is not part of that system.

At some points in their brief, respondents define the supposedly preempted field more broadly as the "field *relating to* the federal employment verification system," *id.,* at 42 (emphasis added); see also *id.,* at 40, but this formulation does not rescue the argument. The submission of tax-withholding forms is *fundamentally unrelated* to the federal employment verification system because, as explained, those forms serve entirely different functions. The employment verification system is designed to prevent the employment of unauthorized aliens, whereas tax-withholding forms help

to enforce income tax laws.  And using another person's So-
cial Security number on tax forms threatens harm that has
no connection with immigration law.

For instance, using another person's Social Security num-
ber on tax-withholding forms affects the wages reported to
federal and state tax authorities.  In addition, many bene-
fits—such as those for disability, unemployment, and re-
tirement—are tied to an individual's work status and in-
come.  Inaccurate data also affect the accuracy of a State's
tax information.[9]

It is true that employees generally complete their W–4's
and K–4's at roughly the same time as their I–9's, but IRCA
plainly does not foreclose all state regulation of information
that must be supplied as a precondition of employment.
New employees may be required by law to provide all sorts
of information that has nothing to do with authorization to
work in the United States, such as information about age
(for jobs with a minimum age requirement), educational de-
grees, licensing, criminal records, drug use, and personal
information needed for a background check.  IRCA surely
does not preclude States from requiring and regulating the
submission of all such information.

Respondents suggest that federal law precludes their
prosecutions because both the Kansas identity-theft statute
and the Kansas false-information statute require proof that
the accused engaged in the prohibited conduct for the pur-
pose of getting a "benefit."  Their argument is as follows.
Since the benefit alleged by the prosecution in these cases
was getting a job, and since the employment verification
system concerns authorization to work, the theory of re-
spondents' prosecutions is related to that system.

This argument conflates the benefit that results from

_____

[9] See, *e.g.*, Kansas Dept. of Revenue, Annual Reports, www.ks
revenue.org/prannualreport.html; Kansas Dept. of Revenue, Tax Fraud
Enforcement, www.ksrevenue.org/taxfraud.html.

complying with the federal employment verification system (verifying authorization to work in the United States) with the benefit of actually getting a job. Submitting W–4's and K–4's helped respondents get jobs, but this did not in any way assist them in showing that they were authorized to work in this country. Thus, respondents' "relating to" argument must be rejected, as must the even broader definitions of the putatively preempted field advanced by respondents at earlier points in this litigation.

Contrary to respondents' suggestion, IRCA certainly does not bar all state regulation regarding the "use of false documents . . . when an unauthorized alien seeks employment." Brief in Opposition 21. Nor does IRCA exclude a State from the entire "field of employment verification." *Id.*, at 22. For example, IRCA certainly does not prohibit a public school system from requiring applicants for teaching positions to furnish legitimate teaching certificates. And it does not prevent a police department from verifying that a prospective officer does not have a record of abusive behavior.

Respondents argue that field preemption in these cases "follows directly" from our decision in *Arizona*, 567 U. S. 387, Brief for Respondents 45–46, but that is not so. In *Arizona*, relying on our prior decision in *Hines* v. *Davidowitz*, 312 U. S. 52 (1941), we held that federal immigration law occupied the field of alien registration. 567 U. S., at 400–402. "Federal law," we observed, "makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation's borders." *Id.*, at 401–402. But federal law does not create a comprehensive and unified system regarding the information that a State may require employees to provide.

In sum, there is no basis for finding field preemption in these cases.

### B

We likewise see no ground for holding that the Kansas statutes at issue conflict with federal law. It is certainly possible to comply with both IRCA and the Kansas statutes, and respondents do not suggest otherwise. They instead maintain that the Kansas statutes, as applied in their prosecutions, stand as "an obstacle to the accomplishment and execution of the full purposes" of IRCA—one of which is purportedly that the initiation of any legal action against an unauthorized alien for using a false identity in applying for employment should rest exclusively within the prosecutorial discretion of federal authorities. Brief for Respondents 49–55. Allowing Kansas to bring prosecutions like these, according to respondents, would risk upsetting federal enforcement priorities and frustrating federal objectives, such as obtaining the cooperation of unauthorized aliens in making bigger cases. *Ibid.*

Respondents analogize these cases to our holding in *Arizona*, 567 U. S., at 404–407—that a state law making it a crime for an unauthorized alien to obtain employment conflicted with IRCA, which does not criminalize that conduct—but respondents' analogy is unsound. In *Arizona*, the Court inferred that Congress had made a considered decision that it was inadvisable to criminalize the conduct in question. In effect, the Court concluded that IRCA implicitly conferred a right to be free of criminal (as opposed to civil) penalties for working illegally, and thus a state law making it a crime to engage in that conduct conflicted with this federal right.

Nothing similar is involved here. In enacting IRCA, Congress did not decide that an unauthorized alien who uses a false identity on tax-withholding forms should not face criminal prosecution. On the contrary, federal law makes it a crime to use fraudulent information on a W–4. 26 U. S. C. §7205.

The mere fact that state laws like the Kansas provisions

at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption. From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today. In recent times, the reach of federal criminal law has expanded, and there are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors. Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap. Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests.

In the present cases, there is certainly no suggestion that the Kansas prosecutions frustrated any federal interests. Federal authorities played a role in all three cases, and the Federal Government fully supports Kansas's position in this Court. In the end, however, the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption. The Supremacy Clause gives priority to "the Laws of the United States," not the criminal law enforcement priorities or preferences of federal officers. Art. VI, cl. 2.

Finally, contrary to respondents' suggestion, these cases are very different from *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341 (2001), and *Wisconsin Dept. of Industry* v. *Gould Inc.*, 475 U. S. 282 (1986). In *Buckman Co.*, the preempted state tort claim for fraud on the Food and Drug Administration threatened serious disruption of the sensitive and highly technical process of approving medical devices. 531 U. S., at 347–353. In these cases, the state prosecutions posed no comparable risk.

In *Gould*, the decision rested on a special preemption rule

governing state laws regulating matters that the National Labor Relations Act "protects, prohibits, or arguably protects." 475 U. S., at 286–289; *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 246 (1959). No similar rule is operative or appropriate here.

*     *     *

For these reasons, the judgments of the Supreme Court of Kansas are reversed, and these cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 17–834

---

## KANSAS, PETITIONER
*v.*
### RAMIRO GARCIA

## KANSAS, PETITIONER
*v.*
### DONALDO MORALES

## KANSAS, PETITIONER
*v.*
### GUADALUPE OCHOA-LARA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[March 3, 2020]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I agree that Kansas' prosecutions and convictions of respondents for identity theft and making false information are not pre-empted by §101(a)(1) of the Immigration Reform and Control Act of 1986, 8 U. S. C. §1324a. I write separately to reiterate my view that we should explicitly abandon our "purposes and objectives" pre-emption jurisprudence.

The founding generation treated conflicts between federal and state laws as implied repeals. *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604, 622 (2011) (plurality opinion). Then, as now, courts disfavored repeals by implication. See, *e.g., Warder* v. *Arell*, 2 Va. 282, 299 (1796) (opinion of President

Judge); 2 T. Cunningham, A New and Complete Law-Dictionary (2d ed. 1771) (defining "Statute"); 4 M. Bacon, A New Abridgment of the Law 638 (3d ed. 1768). To overcome this disfavor, legislatures included *non obstante* clauses in statutes. See Nelson, Preemption, 86 Va. L. Rev. 225, 237–240, and nn. 42–44 (2000) (collecting examples). Courts understood *non obstante* provisions to mean that, "[r]ather than straining the new statute in order to harmonize it with prior law, [they] were supposed to give the new statute its natural meaning and to let the chips fall where they may." *Id.*, at 242.

The Founders included a *non obstante* provision in the Supremacy Clause. It directs that "the Judges in every State shall be bound" by the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Art. VI, cl. 2. If we interpret the Supremacy Clause as the founding generation did, our task is straightforward. We must use the accepted methods of interpretation to ascertain whether the ordinary meaning of federal and state law "directly conflict." *Wyeth* v. *Levine*, 555 U. S. 555, 590 (2009) (THOMAS, J., concurring in judgment). "[F]ederal law pre-empts state law only if the two are in logical contradiction." *Merck Sharp & Dohme Corp.* v. *Albrecht*, 587 U. S. ___, ___ (2019) (THOMAS, J., concurring) (slip op., at 2); see also Nelson, *supra,* at 236–237.

The doctrine of "purposes and objectives" pre-emption impermissibly rests on judicial guesswork about "broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law." *Wyeth*, *supra*, at 587 (opinion of THOMAS, J.); see also *Arizona* v. *United States*, 567 U. S. 387, 440 (2012) (THOMAS, J., concurring in part and dissenting in part). I therefore cannot apply "purposes and

objectives" pre-emption doctrine, as it is contrary to the Supremacy Clause.*

In these cases, the Court correctly distinguishes our "purposes and objectives" precedents and does not engage in a "'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives.'" *Wyeth*, *supra,* at 588 (opinion of THOMAS, J.) (quoting *Bates* v. *Dow Agrosciences LLC*, 544 U. S. 431, 459 (2005) (THOMAS, J., concurring in judgment in part and dissenting in part)). It also acknowledges that "[t]he Supremacy Clause gives priority to 'the laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." *Ante,* at 19. Because the Court rejects respondents' "purposes and objectives" argument without atextual speculation about legislative intentions, I join its opinion in full.

―――――――

*I am also skeptical of field pre-emption, "at least as applied in the absence of a congressional command that a particular field be pre-empted." *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 617 (1997) (THOMAS, J., dissenting). For today, however, it suffices to say that the Court correctly applies our field pre-emption precedents and that "nothing in the text of the relevant federal statutes indicates that Congress intended" to pre-empt a pertinent field. *Arizona*, 567 U. S., at 439 (opinion of THOMAS, J.).

# SUPREME COURT OF THE UNITED STATES

No. 17–834

KANSAS, PETITIONER
*v.*
RAMIRO GARCIA

KANSAS, PETITIONER
*v.*
DONALDO MORALES

KANSAS, PETITIONER
*v.*
GUADALUPE OCHOA-LARA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF KANSAS

[March 3, 2020]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, concurring in part and dissenting in part.

I agree with the majority that nothing in the Immigration Reform and Control Act of 1986 (IRCA), 100 Stat. 3359, expressly preempts Kansas' criminal laws as they were applied in the prosecutions at issue here. But I do not agree with the majority's conclusion about implied preemption.

When we confront a question of implied preemption, the words of the statute are especially unlikely to determine the answer by themselves. Nonetheless, in my view, IRCA's text, together with its structure, context, and purpose, make it "'clear and manifest'" that Congress has occupied at least the narrow field of policing fraud committed to demonstrate federal work authorization. *Arizona* v. *United States*, 567 U. S. 387, 400 (2012) (quoting *Rice* v. *Santa Fe*

*Elevator Corp.*, 331 U. S. 218, 230 (1947)); see Brief for United States as *Amicus Curiae* in *Puente Arizona* v. *Arpaio*, No. 15–15211 etc. (CA9), p. 15 (contending that the Act preempts state criminal laws "to the extent they regulate fraud committed to demonstrate authorization to work in the United States under federal immigration law"); Tr. of Oral Arg. 22–23 (standing by the Government's position in *Puente Arizona*). That is to say, the Act reserves to the Federal Government—and thus takes from the States—the power to prosecute people for misrepresenting material information in an effort to convince their employer that they are authorized to work in this country.

The Act creates what we have called "a comprehensive scheme" to "comba[t] the employment of illegal aliens." *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U. S. 137, 147 (2002). To that end, the statute's text sets forth highly detailed requirements. The Act specifies, for example: that employers and employees must affirm in writing that the employee is authorized to work in the United States, 8 U. S. C. §§1324a(b)(1)(A), (b)(2); that only certain documents suffice to demonstrate identity and work authorization (*e.g.*, a passport or alien-registration card), §§1324a(b)(1)(B)–(D); that employers and employees must affirm the truthfulness of the information they have given by "a hand-written or an electronic signature," §§1324a(b)(1)(A), (b)(2); that all this information must be consolidated on the I–9 form, *ibid.*; that the employer must store the I–9 in "paper, microfiche, microfilm, or electronic" form, typically for three years, §1324a(b)(3); and that employers must make it available for federal inspection, *ibid.*

IRCA also contains two carefully calibrated sets of sanctions for noncompliance. On the employer side, the Act makes it unlawful for employers to hire someone without complying with the I–9 process, §1324a(a)(1)(B), or to recruit, hire, or employ someone the employer knows to be unauthorized, §§1324a(a)(1)(A), (a)(2). The Act subjects

employers who violate these prohibitions to an escalating
series of civil and criminal penalties. See §§1324a(e)(4)–(5),
(f). It also expressly "preempt[s] any State or local law im-
posing civil or criminal sanctions" on those employers, but
with a saving clause that gives States some room to regu-
late employers (and only employers) in this area "through
licensing and similar laws." §1324a(h)(2); see also *Chamber
of Commerce of United States of America* v. *Whiting*, 563
U. S. 582, 587 (2011).

On the employee side, IRCA is somewhat more lenient.
Employees, unlike employers, are not subject to punish-
ment for mere failure to complete the paperwork that the
Act requires. See §1324a(e)(5). And while employees who
work without authorization may suffer adverse immigra-
tion consequences, unauthorized work does not by itself
trigger federal criminal prosecution. See *Arizona*, 567
U. S., at 404–405 (citing §§1227(a)(1)(C)(i), 1255(c)(2),
(c)(8)). Rather, the Act makes it a federal crime for anyone
to commit fraud "for the purpose of satisfying" the Act's re-
quirements. 18 U. S. C. §1546(b).

Our precedent demonstrates that IRCA impliedly
preempts state laws that trench on Congress' detailed and
delicate design. In *Arizona*, we invalidated a state law that
made it a crime for an unauthorized alien to work. 567
U. S., at 403. In reaching that conclusion, we acknowledged
that the Act's employer-related sections contain an express
preemption provision, while the employee-related provi-
sions do not. *Id.*, at 406. Even so, the Act's employee-
related provisions retained, through implication, preemp-
tive force. *Id.*, at 406–407.

Congress, we explained, "made a deliberate choice not to
impose criminal penalties on aliens who" merely "seek, or
engage in, unauthorized employment." *Id.*, at 405. The Act
puts combating the employment of unauthorized aliens at
the forefront of federal immigration policy. *Id.*, at 404. But
it also reflects "a considered judgment" not to pursue that

goal at all costs. *Id.*, at 405. "Unauthorized workers trying to support their families" usually "pose less danger than alien smugglers or aliens who commit a serious crime." *Id.*, at 396. And they may have "children born in the United States, long ties to the community," or other attributes that could counsel in favor of prosecutorial restraint. *Ibid.*

We ultimately held in *Arizona* that the States thus may not make criminal what Congress did not, for any such state law "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." *Id.*, at 406. Given that "obstacle to the regulatory system Congress chose," we concluded that the state law at issue conflicted with the federal Act and was therefore preempted. *Id.*, at 406–407.

State laws that police fraud committed to demonstrate federal work authorization are similarly preempted. Even though IRCA criminalizes that conduct, the Act makes clear that only the Federal Government may prosecute people for misrepresenting their federal work-authorization status. This is so for two reasons.

First, the Act takes from the States the most direct means of policing work-authorization fraud. It prohibits States from using for that purpose both the I–9 and the federal employment verification system more generally. See 8 U. S. C. §§1324a(b)(5), (d)(2)(F). Those two provisions strongly suggest that the Act occupies the field of policing fraud committed to demonstrate federal work authorization. Otherwise, their express prohibitions would not constrain the States in any meaningful way. States could evade the Act simply by creating their own work-authorization form with the same requirements as the I–9, requiring employees to submit that form at the same time as the I–9, and prosecuting employees who make misrepresentations on the state form. No one contends that the States may do *that*.

Second, consider another part of our decision in *Arizona*.

We also addressed in that case a different federal statute, one establishing a federal alien-registration system. See 567 U. S., at 400–403. Pointing to that statute's "full set of standards governing alien registration, including the punishment for noncompliance," we concluded that Congress had enacted "a comprehensive and unified system to keep track of aliens within the Nation's borders." *Id.*, at 401–402. The statute therefore left no room for a state law designed to police violations of the federal alien-registration system. Similarly, IRCA's intricate procedures and penalties create a comprehensive and unified system to keep track of who is authorized to work within the Nation's borders. See *supra*, at 2–3. This too shows that criminal enforcement falls to the Federal Government alone.

Nor does it matter that the state statutes invalidated in *Arizona* had expressly targeted aliens. In preemption cases, we must consider not just what a state law says, but also what it does. *Wos* v. *E. M. A.*, 568 U. S. 627, 637 (2013). For this reason, even generally applicable and facially neutral state laws may be preempted when applied in a particular factual context in a particular way. See, *e.g.*, *Buckman Co.* v. *Plaintiffs' Legal Comm.*, 531 U. S. 341, 347–350 (2001) (rejecting claims grounded in generally applicable state-law principles because they were based on a preempted theory of liability); *Northwest, Inc.* v. *Ginsberg*, 572 U. S. 273, 289 (2014) (similar). And here, Kansas applied its criminal laws to do what IRCA reserves to the Federal Government alone—police fraud committed to demonstrate federal work authorization. That is true even though Kansas prosecuted respondents based on their tax-withholding forms, rather than their I–9s.

Take Donaldo Morales, for example. Kansas charged him under two state antifraud statutes. Both required the State to prove, as an element, an intent to defraud. See Kan. Stat. Ann. §§21–5824(a), 21–6107(a)(1) (2018 Cum. Supp.). Kan-

sas law defines "intent to defraud" as the "intention to de-
ceive another person, and to induce such other person, in
reliance upon such deception, to" transfer a property right.
§21–5111(o). Kansas' theory of guilt was that Morales in-
tended to deceive his employer about his federal work-
authorization status so that his employer, in reliance upon
that deception, would give him a job. At trial, the State
elicited testimony that employees needed "proof of eligibil-
ity to work in the United States." App. 149. It then argued
that Morales knew people like him had to use a false Social
Security number to get a job because of "how they were
here." *Id.*, at 176. The trial court, sitting as the finder of
fact, confirmed how it understood the reliance that Morales
induced: Morales convinced his employer that he was "a le-
gal citizen," even though he was in truth "undocumented."
*Id.*, at 179–181.

On different facts, there would have been no preemption.
Had Kansas proved instead that Morales used a false Social
Security number on his tax-withholding forms to induce an-
other sort of reliance (*e.g.*, to hide a criminal history), or
perhaps to obtain another kind of benefit (*e.g.*, to pay less
in taxes), IRCA would permit the prosecution. But that is
not what Kansas did. What Kansas did was prosecute Mo-
rales for misrepresenting his federal work-authorization
status for the purpose of obtaining employment. Kansas'
prosecution of Morales thus fell squarely within the field
that, in my view, the federal Act preempts.

By permitting these prosecutions, the majority opens a
colossal loophole. Starting a new job almost always in-
volves filling out tax-withholding forms alongside an I–9.
So unless they want to give themselves away, people hoping
to hide their federal work-authorization status from their
employer will put the same false information on their tax-
withholding forms as they do on their I–9. To let the States
prosecute such people for the former is, in practical effect,
to let the States police the latter. And policing the latter is

what the Act expressly forbids.

For these reasons, I would hold that federal law impliedly preempted Kansas' criminal laws as they were applied in these cases. Because the majority takes a different view, with respect, I dissent.