## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**Opinion Number: 2021-NMCA-019**

**Filing Date: February 11, 2021**

**No. A-1-CA-35715**

**STATE OF NEW MEXICO,**

      Plaintiff-Appellee,

v.

**DANIEL PRIETO-LOZOYA,**

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**John A. Dean, Jr., District Judge**

Certiorari Denied, March 31, 2021, No. S-1-SC-38728. Released for Publication June 29, 2021.

Hector H. Balderas, Attorney General
Santa Fe, NM
John Kloss, Assistant Attorney General
Laurie P. Blevins, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**ATTREP, Judge.**

**{1}** The State charged Defendant Daniel Prieto-Lozoya with identity theft for using another's personal identifying information on documents Defendant submitted to his employer during the hiring process. Among these documents was a federal Employment Eligibility Verification Form (hereinafter I-9), in which the federal government requires employers to verify that an employee may lawfully work in the

United States. In this appeal, we examine whether the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359 (codified as amended in scattered sections of 8 U.S.C.), preempts Defendant's conviction for identity theft under these circumstances. We conclude that the State's use of the I-9 at Defendant's trial was expressly preempted by IRCA. Because Defendant's conviction may well have been predicated on the I-9, as opposed to another document relied on by the State, we reverse and remand for a new trial. We conclude that Defendant's other claims of error are without merit.

**BACKGROUND**

**{2}** At trial, the State presented evidence that in March 2012 Defendant applied for a job in Farmington, New Mexico, with a company called Hurricane Air and Swabbing Services (Hurricane). Defendant, who apparently was not authorized to be in the United States at the time, did not apply for the job in his own name; instead, Defendant used the identity of someone else, Ulysses Tafoya.

**{3}** Cesar Polanco, the person responsible for hiring at Hurricane during the relevant time, identified Defendant at trial and testified that Defendant submitted documentation to him as part of the hiring process. In particular, Defendant submitted: a social security card bearing Tafoya's name and social security number; a permanent resident card bearing Tafoya's name and date of birth, but with Defendant's image; a W-4 (a federal tax-withholding form), bearing Tafoya's name and social security number; an I-9 bearing Tafoya's name, social security number, and date of birth; and an employee signature card, signed in Tafoya's name. During Defendant's employment with Hurricane, a number of paychecks were issued in Tafoya's name and cashed, but no witness could establish who cashed the checks.

**{4}** Tafoya also testified, explaining that, at some point, he was contacted by the Internal Revenue Service (IRS) and informed that he owed taxes on his ostensible earnings from work in Farmington. Tafoya, who was a lifelong resident of El Paso, Texas, had never visited Farmington, let alone worked there. After speaking with the IRS, Tafoya filed a police report in El Paso claiming that his identity had been stolen. Tafoya also called Hurricane to inform the company that somebody was using his name and social security number to work there. Tafoya additionally testified that he did not authorize Defendant to use his personal identifying information.

**{5}** Defendant was tried for one count of identity theft, in violation of NMSA 1978, Section 30-16-24.1 (2009); one count of altered, forged, or fictitious license, in violation of NMSA 1978, Section 66-5-18(C) (2004); and eight counts of forgery, in violation of NMSA 1978, Section 30-16-10(A) (2006). One of the forgery counts alleged Defendant forged Tafoya's signature on the W-4. The remaining forgery counts alleged Defendant forged Tafoya's signature on several paychecks issued in Tafoya's name. After the district court dismissed the count pertaining to the license, the jury acquitted Defendant of all the forgery charges but convicted him of identity theft. We reserve further discussion of the facts for our analysis.

**DISCUSSION**

**{6}** Defendant makes numerous arguments on appeal, asserting: (1) his conviction for identity theft is preempted by IRCA; (2) insufficient evidence supports his conviction; (3) his right to a speedy trial was violated; (4) he received ineffective assistance of counsel; and (5) the district court abused its discretion in admitting a particular exhibit. We first conclude that Defendant's conviction for identity theft is expressly preempted by IRCA and, thus, reverse his conviction on this basis. Because we conclude that sufficient evidence exists to sustain Defendant's conviction, we remand for retrial. We additionally examine Defendant's speedy trial claim because, if successful, it would afford Defendant greater relief; but we affirm the district court's denial of Defendant's speedy trial motion. We do not reach Defendant's remaining contentions because they do not affect our disposition of this appeal.

## I.    Preemption

**{7}** Defendant's core contention on appeal is that his conviction for identity theft is preempted by federal law. In particular, he argues that the State's use of the I-9 is expressly preempted by IRCA. He further argues that his conviction for identity theft, involving alleged misfeasance during the hiring process by a person not authorized to be in this country, is a matter of federal policy and enforcement and is impliedly preempted by IRCA. We first examine the appropriate standard of review for Defendant's preemption claim because Defendant did not raise this issue below. We then examine federal preemption principles and IRCA and, with these in mind, evaluate Defendant's preemption arguments. We conclude that IRCA expressly preempts Defendant's conviction to the extent it was based on the I-9. Because we cannot discern whether the jury relied on this preempted basis or some other, non-preempted basis, we conclude fundamental error has resulted and we reverse Defendant's conviction. Finally, we conclude that Defendant's implied preemption argument is foreclosed by the United States Supreme Court's decision in *Kansas v. Garcia* (*Garcia II*), ___ U.S. ___, 140 S. Ct. 791 (2020), the Court's most recent examination of IRCA's preemptive effect.[1]

## A.    Preservation and Standard of Review

**{8}** Defendant acknowledges that he did not raise his preemption challenge in district court. He nevertheless assumes federal preemption is a jurisdictional issue that may be raised at any time, and the State agrees with this assumption. *See* Rule 12-321(B)(1) NMRA ("Subject matter jurisdiction of the trial or appellate court may be raised at any time."). Neither party, however, cites any authority for the proposition that a state court

---

[1]Defendant relied heavily on *State v. Garcia* (*Garcia I*), 401 P.3d 588 (Kan. 2017), *rev'd and remanded by Garcia II*, 140 S. Ct. 791, in support of his contentions that his identity theft conviction is both expressly and impliedly preempted. Because *Garcia I* was pending before the United States Supreme Court at the time Defendant's appeal was submitted and *Garcia I* raised preemption issues similar to those advanced by Defendant, we stayed this matter. Upon issuance of the Supreme Court's decision in *Garcia II*, we ordered supplemental briefing from the parties to update their arguments in light of *Garcia II*. We have duly considered *Garcia II* and the parties' supplemental briefing in our resolution of this appeal.

loses jurisdiction when a federal law preempts the application of a state criminal law. And in New Mexico, our Supreme Court has indicated that the question is not as clear as the parties assume. *See, e.g.*, *Gonzales v. Surgidev Corp.*, 1995-NMSC-036, ¶¶ 10-17, 120 N.M. 133, 899 P.2d 576 (discussing, in a civil context, the difference between "choice-of-forum preemption," which deprives a state court of subject matter jurisdiction, and "choice-of-law preemption," which does not); *cf. State v. Orosco*, 1992-NMSC-006, ¶ 7, 113 N.M. 780, 833 P.2d 1146 ("[T]he term 'jurisdictional error' should be confined to instances in which the court was not competent to act and . . . it is inappropriate to equate jurisdictional error with other instances in which an error may be raised for the first time on appeal."). In the absence of briefing from the parties on this matter, we decline to decide this question today. *See, e.g.*, *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 (stating that "[i]t is of no benefit either to the parties or to future litigants for [a c]ourt to promulgate case law based on [its] own speculation rather than the parties' carefully considered arguments").

**{9}**     We instead exercise our discretion to review Defendant's preemption claim for fundamental error. *See* Rule 12-321(B)(2)(c) (providing that an appellate court, in its discretion, may consider issues of fundamental error for the first time on appeal); *State v. Samora*, 2013-NMSC-038, ¶ 5, 307 P.3d 328 (reviewing unpreserved constitutional claim for fundamental error); *see also Corcoran v. Sullivan*, 112 F.3d 836, 837 (7th Cir. 1997) ("Any claim of federal preemption of a state statute is a federal constitutional claim because the basis of such preemption is the supremacy clause[.]"); *Fuentes-Espinoza v. People*, 2017 CO 98, ¶ 19, 408 P.3d 445 (exercising discretion to review an unpreserved preemption claim where "doing so would best serve the goals of efficiency and judicial economy").

## B.     Preemption Principles

**{10}**     The Supremacy Clause of the United States Constitution provides that the United States Constitution, federal statutes, and treaties are "the supreme Law of the Land." U.S. Const. art. VI, cl. 2; *see also Garcia II*, 140 S. Ct. at 801. This clause grants Congress the power to preempt the application or exercise of state law in particular areas and under particular circumstances. *See Arizona v. United States*, 567 U.S. 387, 399 (2012). Congress may do so expressly or impliedly. *Id.* Express preemption occurs when Congress "withdraw[s] specified powers from the [s]tates by enacting a statute containing an express preemption provision." *Id.* Implied preemption may take one of two forms: field preemption, when federal interests, regulation, or activity occupy an entire field, leaving no room for states to act; or conflict preemption, when a state law conflicts with a federal law. *See id.* A state law not appearing on its face to be preempted may in fact be preempted as applied to a particular situation. *See United States v. Supreme Court of N.M.*, 839 F.3d 888, 907 (10th Cir. 2016).

**{11}**     New Mexico's identity theft statute, under which Defendant was convicted, prohibits "obtaining, recording or transferring personal identifying information of another person without the authorization or consent of that person and with the intent to defraud

that person or another[.]"[2] Section 30-16-24.1(A). Defendant does not make a facial challenge to the identity theft statute. He instead makes an as-applied challenge under the circumstances of this case, contending that his identity theft conviction is expressly and impliedly preempted by IRCA.

## C. IRCA

**{12}** IRCA has been described "as a comprehensive framework for combating the employment of illegal aliens."[3] *Arizona*, 567 U.S. at 404 (internal quotation marks and citation omitted). IRCA makes it unlawful for an employer to knowingly hire an "unauthorized alien," i.e., a non-citizen or non-national who is not authorized to work in the United States. 8 U.S.C. §§ 1101(a)(3), 1324a(1)(A), (h)(3). To enforce this prohibition, IRCA created an "employment verification system" requiring employers to attest under penalty of perjury on the I-9, or other designated form, that an employee is not an unauthorized alien. § 1324a(b)(1)(A); 8 C.F.R. § 274a.2(a)(2) (2020) (creating the I-9). The employer makes the attestation after reviewing approved documents submitted by the employee, evidencing the employee's identity and authorization to work in the United States. § 1324a(b)(1)(A)(i), (ii); *see also* § 1324a(b)(1)(B)-(D) (listing approved documents, such as a resident alien card or a social security card along with an identification card). IRCA allows employers to copy and retain documents provided by employees, but only "for the purpose of complying with the [employment verification system]." § 1324a(b)(4).

**{13}** Critical to Defendant's appeal, IRCA strictly limits how the I-9 and, more broadly, the employment verification system as a whole may be used. Specifically, § 1324a(b)(5), titled "Limitation on use of attestation form," provides that the I-9 "and any information contained in or appended to such form, may not be used for purposes other than for enforcement of this chapter" and certain enumerated federal criminal statutes. Furthermore, IRCA provides that the employment verification "system may not be used for law enforcement purposes," other than for the enumerated exceptions just listed. § 1324a(d)(2)(F); *see also* § 1324a(d)(2)(C) ("Any personal information utilized by the [employment verification] system may not be made available to [g]overnment agencies, employers, and other persons except to the extent necessary to verify that an individual is not an unauthorized alien.").

## D. Express Preemption

**{14}** We turn now to Defendant's express preemption argument. Because we review this issue for fundamental error, we first examine whether there was error and, if so, we then examine whether that error was fundamental. *State v. Silva*, 2008-NMSC-051, ¶ 11, 144 N.M. 815, 192 P.3d 1192.

---

[2]"Personal identifying information" consists of a "person's name, . . . social security number, [or] date of birth," among other things. Section 30-16-24.1(C)(2).

[3]We use the term "alien" in this opinion because that is the term Congress uses to describe "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

### 1. The Use of the I-9 Was Expressly Preempted and Thus Constituted Error

**{15}** Defendant's express preemption argument is straightforward: (1) § 1324a(b)(5) prohibits the use of the I-9 except for the few enumerated purposes; (2) the State introduced the I-9 to prove the identity theft charge, a non-enumerated purpose; and (3) therefore Defendant's identity theft conviction is preempted by § 1324a(b)(5).[4] For the reasons that follow, we conclude that the State's use of the I-9 was prohibited by § 1324a(b)(5) and Defendant's identity theft conviction was preempted to the extent it was based on the I-9.

**{16}** "Because the question of whether state law has been preempted by federal legislation depends upon whether Congress intended such a result, the purpose of Congress is the ultimate touchstone." *State v. Herrera*, 2014-NMCA-003, ¶ 7, 315 P.3d 311 (alteration, internal quotation marks, and citation omitted). Where, as here, "the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."[5] *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). Turning then to the language of § 1324a(b)(5), we think Congress' intent is clear. This provision provides that an I-9 "may not be used for purposes other than for enforcement of this chapter" and certain enumerated federal criminal statutes. § 1324a(b)(5); *see also* § 1324a(d)(2)(F) (prohibiting the use of the federal employment verification system, of which the I-9 is an integral part, for any law

---

[4]We limit our preemption analysis to the State's use of the I-9 and the W-4, and we do not address the State's use of the social security or permanent resident cards or the federal employment verification system more generally. We do so for several reasons. First, the parties' briefing focuses on the I-9 and the W-4 and makes no contentions about the use of the other documents. Second, it is not apparent from the record whether the social security and permanent resident cards were submitted to Hurricane solely as part of the employment verification process under IRCA or whether they served some other purpose— a fact that very well could impact our analysis. *See, e.g.*, *Puente Arizona v. Arpaio*, No. CV-14-01356-PHX, 2017 WL 1133012, at *8 (order) (D. Ariz. Mar. 27, 2017) (holding that § 1324a(b)(5) preempts the use of any documents or information submitted to an employer *solely* as part of the federal employment verification system but does not preempt the use of such documents "if they were also submitted for a purpose independent of the federal employment verification system"). Third, to the extent Defendant does raise an argument about the use of the federal employment verification system more generally, we observe that it was Defendant who inquired into matters about this system—questioning various witnesses about the I-9 verification process and Immigration and Naturalization Service audits pertaining to Hurricane's hiring process. It is well-settled that invited error cannot provide the basis for fundamental error. *See State v. Handa*, 1995-NMCA-042, ¶ 35, 120 N.M. 38, 897 P.2d 225 ("[T]he doctrine of fundamental error has no application in cases where the defendant, by his own actions, invites error."). We consequently limit our analysis. We do, however, express concern that, at retrial, the State's use of documents submitted solely in connection with the I-9 or evidence pertaining to the federal employment verification system in general might cause the same preemption problems we address today; and we caution the State accordingly. *See, e.g.*, *Garcia II*, 140 S. Ct. at 803 (observing that § 1324a(d)(2)(F) "prohibits use of the federal employment verification system for law enforcement purposes other than enforcement of IRCA and [a] handful of federal statutes mentioned in § 1324a(b)(5)" (internal quotation marks and citation omitted)); *Puente Arizona*, No. CV-14-01356-PHX, 2017 WL 1133012, at *8 ("Congress clearly and manifestly intended to prohibit the use of the Form I-9, documents attached to the Form I-9, and documents submitted as part of the I-9 employment verification process, whether attached to the form or not, for state law enforcement purposes.").

[5]Both parties treat § 1324a(b)(5) as an express preemption clause, and we do the same.

enforcement purpose, other than for these same enumerated exceptions). The State's prosecution of Defendant for identity theft plainly does not fall within the exceptions enumerated in § 1324a(b)(5). From this, it is evident that Congress intended to forbid the State from using the I-9 in state prosecutions like Defendant's.

**{17}**　Case law throughout the country is in line with this conclusion. We are aware of no case holding that use of an I-9 as evidence in a state criminal prosecution is permissible. In fact, in many of the cases discussing the matter, the prosecution either disclaimed reliance on the I-9 if IRCA was invoked before trial or conceded on appeal that it was error to introduce the I-9 at trial. *See, e.g.*, *Garcia II*, 140 S. Ct. at 798, 800 (providing that, under § 1324a(b)(5), "I-9 forms and any information contained in or appended to such forms may not be used for purposes other than for enforcement of [this chapter] or other listed federal statutes" and observing that the state in response to the defendants' preemption challenges under § 1324a(b)(5) dismissed the charges based on the I-9's and agreed not to rely on the I-9's at trial (alteration, internal quotation marks, and citation omitted)); *State v. Hernandez-Manrique*, No. 110,950, 2016 WL 5853078, at **1, 3 (Kan. Ct. App. Sept. 30, 2016) (per curiam) (non-precedential) (observing that the court "has found the IRCA prohibits a state from prosecuting a defendant for putting false information on an I-9 or other federal employment eligibility form" and that the state amended its criminal complaint to omit any reliance on the I-9 (internal quotation marks and citation omitted)); *State v. Reynua*, 807 N.W.2d 473, 479-80 (Minn. Ct. App. 2011) (holding that IRCA bars the use of the I-9 in state prosecutions and noting that the state conceded on appeal that it was reversible error to admit the I-9 into evidence); *see also, e.g.*, *People v. Zarco*, 2014 IL App (1st) 123463-U, ¶ 19 (order) (Ill. App. Ct. May 22, 2014) (holding that the defendant's forgery charge based on the I-9 was preempted by IRCA); *Puente Arizona*, No. CV-14-01356-PHX, 2017 WL 1133012, at *8 (holding that, under IRCA, the prosecution is "preempted from (a) employing or relying on (b) any documents or information (c) submitted to an employer solely as part of the federal employment verification process (d) for any investigative or prosecutorial purpose under the Arizona identify theft and forgery statutes").

**{18}**　In an attempt to avoid IRCA's preemptive effect here, the State argues: (1) § 1324a(b)(5) applies only to employers, not employees; and (2) even if its use of the I-9 was preempted by IRCA, reversal is not warranted because the jury could have relied on the W-4 in support of Defendant's identity theft conviction, the use of which is not preempted. We address the State's first argument here and examine its second argument within the context of our fundamental error analysis below.

**{19}**　The State argues that IRCA's preemption provision "precludes state legislation establishing criminal sanctions against employers based on an I-9, but not ones against employees." This contention is belied by United States Supreme Court precedent. The Court in *Arizona* observed that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment" and held that a state law criminalizing such conduct was preempted by IRCA. 567 U.S. at 405. This conclusion was underscored in *Garcia II*, where the Court plainly stated that it

is not a federal crime for an alien to work without authorization, and state laws criminalizing such conduct are preempted. 140 S. Ct. at 798. What is more, the State's argument is refuted by the plain language of § 1324a(b)(5), which "broadly restricts *any use* of an I-9, information contained in an I-9, and any documents appended to an I-9." *Garcia II*, 140 S. Ct. at 802 (describing § 1324a(b)(5) as "far more than a preemption provision" because it applies not just to states but to the federal government and all private actors); *see also Crooks v. Harrelson*, 282 U.S. 55, 60 (1930) (providing that a court may depart from "the literal terms of a statute only under rare and exceptional circumstances"). Further, none of the cases we have reviewed mention even the possibility that § 1324a(b)(5) is restricted to employers, as the State suggests. The State does not cite any state or federal court case law imposing such a limitation on § 1324a(b)(5), nor do the administrative law decisions the State cites support such a limitation. *See State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 (noting, where no authority is cited in support of an issue, appellate courts will not consider the issue and will assume no such authority exists). In short, the State's argument against the applicability of § 1324a(b)(5) in this case is without merit.

**{20}** Congress' intent being clear, we conclude that the State's use of the I-9 in support of Defendant's identity theft conviction was prohibited by IRCA and constituted error and that Defendant's identity theft conviction was preempted to the extent it was based on the I-9.

## 2. The Use of the I-9 Constituted Fundamental Error

**{21}** We consider next whether this error is fundamental, requiring reversal of Defendant's conviction. *See Silva*, 2008-NMSC-051, ¶ 11. As noted, the State contends that reversal is not warranted because the W-4 supported Defendant's conviction and its use is not preempted by IRCA. Defendant, in contrast, contends that reversal is required because the I-9 was the sole basis for his conviction. We first briefly acknowledge that, under *Garcia II*, the use of a W-4, or other similar tax-withholding form, is not preempted by IRCA. We next examine principles of fundamental error in this context—i.e., where one possible basis for a conviction is preempted and the other is not. Finally, determining that we cannot discern the basis for the jury's verdict, we hold that Defendant's conviction constitutes fundamental error and we reverse and remand for a new trial.

### a. The Use of the W-4

**{22}** Under *Garcia II*, it is clear that the State's use of the W-4 at Defendant's trial was not preempted by IRCA. *Garcia II* involved three consolidated cases in which the prosecutions proceeded on the theory that the defendants, all unauthorized aliens, committed identity theft when using stolen social security numbers on W-4's (and equivalent state tax-withholding forms) submitted to their employers. *Garcia II*, 140 S. Ct. at 799-800. All three defendants were convicted of identity theft, but their convictions were overturned by the Kansas Supreme Court on preemption grounds. *Id.* at 797. The Kansas court adopted an expansive view of the preemption provision in § 1324a(b)(5).

Even though the I-9's were not admitted at trial, the Kansas court reasoned that because the stolen social security numbers used on the tax-withholding forms were "contained in" the I-9's, IRCA prohibited the prosecutions from relying on the tax-withholding forms as the bases for the convictions. *Garcia I*, 401 P.3d at 599; *see also* § 1324a(b)(5) (prohibiting the use of the I-9 "and any information contained in or appended to such form").

**{23}** The United States Supreme Court disagreed with this interpretation of § 1324a(b)(5), concluding that "the mere fact that an I-9 contains an item of information, such as a name or address, does not mean that information 'contained in' the I-9 is used whenever that name or address is later employed." *Garcia II*, 140 S. Ct. at 803. The Court also explained that tax-withholding forms, such as the W-4, are "*fundamentally unrelated*" to the I-9 and the federal employment verification system and observed that "using another person's [s]ocial [s]ecurity number on tax forms threatens harm that has no connection with immigration law." *Id.* at 805; *see also id.* (observing that "[s]ubmitting W-4's and K-4's helped respondents get jobs, but this did not in any way assist them in showing that they were authorized to work in this country"). The Supreme Court thus limited the reach of § 1324a(b)(5)'s "contained in" clause, making clear that the use of documents other than the I-9, such as the W-4, did not run afoul of § 1324a(b)(5), notwithstanding the fact that the W-4 contained information also found in the I-9. *Garcia II*, 140 S. Ct. at 804. The Court, however, did nothing to modify the clear prohibition in § 1324a(b)(5) against the use of the I-9 itself. *See Garcia II*, 140 S. Ct. at 802 (observing that § 1324a(b)(5) is "far more than a preemption provision" because it "broadly restricts *any use* of an I-9" by states, the federal government, and all private actors). Given *Garcia II*, we conclude that the State's use of the W-4 in this case was not prohibited or preempted by IRCA.

### b.    Fundamental Error in This Context

**{24}** Whether, as the State suggests, the fact that the W-4 was not preempted means the State's use of the I-9 was not fundamental error is another matter.[6] "Fundamental error consists of error that goes to: (1) the foundation of a defendant's rights, (2) the foundation of the case, or (3) a right essential to the defense of an accused, which no court could or ought to permit him to waive." *Campos v. Bravo*, 2007-NMSC-021, ¶ 18, 141 N.M. 801, 161 P.3d 846 (internal quotation marks and citation omitted). Under the doctrine of fundamental error, "a conviction will only be reversed if the defendant's guilt is so questionable that upholding a conviction would shock the conscience, or where, notwithstanding the apparent culpability of the defendant, substantial justice has not been served." *Id.* (internal quotation marks and citation omitted). "Substantial justice has not been served when a fundamental unfairness within the system has undermined judicial integrity." *Id.*

---

[6]With little explanation, the State contends the admission of the I-9 was non-constitutional harmless error. As stated, we review Defendant's unpreserved preemption challenge for fundamental, not harmless, error.

**{25}** Our Supreme Court has held that "[i]t is fundamental error to convict a defendant of a crime that does not exist." *State v. Maestas*, 2007-NMSC-001, ¶ 9, 140 N.M. 836, 149 P.3d 933. By virtue of the Supremacy Clause, a "state statute (more precisely, so much of it as is preempted) is wiped out as effectively as if it had been repealed; and the defendant can no more be convicted under it, consistent with due process, than he could be convicted under a repealed statute." *Corcoran*, 112 F.3d at 838; *see also, e.g., Rini v. United Van Lines, Inc.*, 104 F.3d 502, 504 (1st Cir. 1997) ("[A] state statute is void to the extent it is in conflict with a federal statute."); *cf. Zarco*, 2014 WL 2168875, ¶ 21 (concluding that a plea agreement to a preempted forgery charge is void because the charge is unenforceable or illegal). As a consequence, upholding a conviction under a state statute that is preempted, or more precisely, to the extent it is preempted, would be fundamental error. *See Campos*, 2007-NMSC-021, ¶ 19 (concluding that it would be fundamental error to uphold a conviction that is a legal nullity); *cf. State v. Arrendondo*, 2012-NMSC-013, ¶ 20, 278 P.3d 517 (noting that our appellate courts have a "responsibility to question sua sponte a conviction for a nonexistent crime, because otherwise fundamental error would not be corrected").

**{26}** In this case, one possible basis for Defendant's conviction (the use of Tafoya's identity on the I-9) is preempted and thus is legally inadequate, while another possible basis (the use of Tafoya's identity on the W-4) is not. In such circumstances, reversal is required if it is not possible to tell on which ground the jury based its verdict. *See Campos*, 2007-NMSC-021, ¶ 19 (holding that fundamental error occurs if a conviction could be based on either of two alternatives, one of which is legally inadequate, even if ample evidence supports the legally adequate alternative); *State v. Olguin*, 1995-NMSC-077, ¶ 2, 120 N.M. 740, 906 P.2d 731 (holding that where a general verdict is returned, a conviction must be reversed if the jury was presented with a legally inadequate basis for conviction); *see also Williams v. North Carolina*, 317 U.S. 287, 292 (1942) ("[T]he verdict of the jury for all we know may have been rendered on that [unconstitutional] ground alone, since it did not specify the basis on which it rested. . . . To say that a general verdict of guilty should be upheld though we cannot know that it did not rest on the invalid constitutional ground on which the case was submitted to the jury, would be to countenance a procedure which would cause a serious impairment of constitutional rights."); *cf. State v. Crain*, 1997-NMCA-101, ¶ 22, 124 N.M. 84, 946 P.2d 1095 (holding that courts will set aside a conviction where the verdict does not state the alternative on which the jury relied and where one of the alternatives would violate the defendant's double jeopardy rights).

## c. The Basis for Defendant's Conviction

**{27}** We therefore must determine whether we can discern the basis for the jury's verdict. Unlike the other charges against Defendant, the criminal information and jury instruction for identity theft did not specify the document or documents that served as the basis for this offense. And although the State opined, during its opening statement, that Defendant used Tafoya's personal identifying information "to get a job" at

Hurricane, the State never tied this theory to any specific document.[7] Polanco testified that, at the outset of Defendant's employment with Hurricane, Defendant submitted a packet of five documents: a social security card, a permanent resident card, the W-4, the I-9, and an employee signature card. The State, however, did not identify which of these documents supported its theory of identity theft or explain to the jury the importance of any of these documents. Given this record, we are unable to discern whether the I-9 served as the basis for Defendant's identity theft conviction. And the parties' arguments on appeal do not clarify the matter.

**{28}** Defendant contends that the I-9 was the sole basis for the identity theft conviction and that reversal is required. In support, Defendant argues that his acquittal on the charge of forging the W-4 proves the jury did not rely on that form in reaching its identity theft verdict and, thus, his conviction was based solely on the I-9. It, however, is axiomatic that a jury may arrive at seemingly inconsistent results on different charges and that such an occurrence does not invalidate a conviction. *See State v. Roper*, 2001-NMCA-093, ¶ 24, 131 N.M. 189, 34 P.3d 133 ("We have frequently said that our business is to review the verdicts of conviction, and not concern ourselves with any alleged acquittals, and thus we do not entertain contentions alleging that the verdicts are irreconcilable."). In other words, we will not infer from an acquittal on a different count that the jury must have reached a particular conclusion about the charge that resulted in a conviction. *See id.* Moreover, Defendant ignores the fact that the W-4 could have supported the State's theory presented during opening statements. As noted, Defendant submitted the W-4, along with other employment-related documents, to Hurricane during the hiring process. According to the United States Supreme Court, tax-withholding documents, such as the W-4, may play some role in assisting an individual in obtaining employment. *See Garcia II*, 140 S. Ct. at 805 ("Submitting W-4's and K-4's helped respondents get jobs[.]").

**{29}** In contrast to Defendant, the State largely ignores the possibility that the I-9 might have served as a basis for Defendant's conviction and, as noted, contends that reversal is not warranted because the jury could have relied on the W-4. But, simply stated, the State's contention that the jury *could* have relied on the W-4 does nothing to forestall a finding of fundamental error, when we are unable to determine that the jury *in fact* relied only on the W-4. *See, e.g.*, *Campos*, 2007-NMSC-021, ¶ 19.

---

7The State did shift gears in closing argument, focusing on the W-4 and arguing, without any basis in the evidence, that Defendant used Tafoya's information to "defraud" the American taxpayers by claiming more dependents than he should have. Given the lack of evidence in the record concerning the number of dependents Defendant actually was entitled to claim, this argument only could have served to confuse the jury. Moreover, the State abandons this argument on appeal. The State now argues that "Defendant used stolen documents in order to deceive Hurricane's hiring manager into believing that Defendant was legally authorized to work." But the State at trial was not this specific, telling the jury only that Defendant used Tafoya's identity "to get a job" at Hurricane. Had the State's theory indeed been that Defendant intended to deceive Hurricane into believing he was "legally authorized to work," we would be hard pressed to determine that anything other than the I-9 served as the basis for Defendant's identity theft conviction. *See Garcia II*, 140 S. Ct. at 797-98, 805 (explaining how I-9 evidences "authorization to work" and that a W-4 does not assist in showing authorization to work).

**{30}** In sum, notwithstanding the parties' arguments, we cannot discern whether the basis for Defendant's identity theft conviction was the I-9, the W-4, or something else. Because we cannot say that the jury did not convict Defendant on a federally preempted basis, we conclude that substantial justice has not been served and fundamental error has resulted. *See id.* ¶ 21 ("Since we have no idea whether [the defendant] was convicted of a valid crime, substantial justice was not served at [the defendant's] trial; fundamental error results."). We therefore reverse Defendant's conviction and remand for a new trial, at which the I-9 will play no role. *See id.* (vacating the defendant's conviction but remanding for a new trial "should the [s]tate elect to retry [the defendant] using a valid predicate"); *see also State v. Downey*, 2008-NMSC-061, ¶ 40, 145 N.M. 232, 195 P.3d 1244 (relying on *Campos* and providing the same remedy where the conviction "may have rested on an invalid legal basis").

### E. Implied Preemption

**{31}** We briefly address Defendant's implied preemption argument because, given its breadth, retrial would appear to be barred if Defendant were successful on this claim. Relying principally on a concurrence in *Garcia I*, Defendant asserts that IRCA prohibits the State from prosecuting him, an unauthorized alien, "for identity theft based on false documentation supplied to Hurricane during the hiring process" because Congress has occupied the field of the employment of aliens and state enforcement of its laws in this context would obstruct congressional policy.

**{32}** To the extent Defendant's implied preemption argument is based, as was his express preemption argument, on the use of the I-9, we deem it unnecessary to analyze such a claim since we already have determined that the use of the I-9 was expressly preempted. To the extent Defendant's implied preemption argument is based on other false documentation supplied to Hurricane, such as the W-4, the Supreme Court's holding in *Garcia II* squarely addressed and rejected such an argument. In brief, *Garcia II* held that "IRCA certainly does not bar *all* state regulation regarding the use of false documents when an unauthorized alien seeks employment. Nor does IRCA exclude a [s]tate from the *entire* field of employment verification." 140 S. Ct. at 805 (emphases added) (omission, internal quotation marks, and citations omitted); *see also id.* at 806 (rejecting the contention that "the initiation of any legal action against an unauthorized alien for using a false identity in applying for employment should rest exclusively within the prosecutorial discretion of federal authorities"). For these same reasons, we likewise reject Defendant's argument that IRCA impliedly preempted the State from prosecuting him for identity theft based on false documentation supplied to Hurricane.

### II. Sufficiency of the Evidence

**{33}** Defendant challenges the sufficiency of the evidence to support his identity theft conviction. We address this issue because if Defendant prevailed, he would be entitled to greater relief—his conviction would be reversed and retrial would be barred. *See State v. Verdugo*, 2007-NMCA-095, ¶ 1, 142 N.M. 267, 164 P.3d 966 ("[B]ecause [the d]efendant would be entitled to dismissal of the charges if the evidence is insufficient to

support them, we address [the d]efendant's challenge to the sufficiency of the evidence issue."). In conducting our review, we view the evidence in the light most favorable to the state to determine whether substantial evidence exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction. *See State v. Montoya*, 2015-NMSC-010, ¶¶ 52-53, 345 P.3d 1056.

**{34}** The jury in this case was instructed on the elements of identity theft in accordance with the statutory language. *See State v. Jackson*, 2018-NMCA-066, ¶ 22, 429 P.3d 674 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)). In relevant part, the jury had to find that Defendant "willfully obtain[ed], record[ed,] or transfer[red] personal identifying information of . . . Tafoya or another person . . . with the intent to defraud . . . Tafoya, or another." *See* § 30-16-24.1(A). In New Mexico, an "intent to defraud" has been equated with an intent to deceive or cheat. *See State v. Rodarte*, 2011-NMCA-067, ¶ 11, 149 N.M. 819, 255 P.3d 397 (construing, for the crime of fraudulent refusal to return leased property, "intent to defraud" as meaning "intent to cheat or deceive" (alteration, internal quotation marks, and citation omitted)); *see also, e.g.*, UJI 14-1640 NMRA comm. cmt. (providing, for the crime of fraud, that " '[f]raudulent intent' and 'fraudulently' are frequently defined as 'with intent to defraud' or 'with intent to cheat or deceive' ").

**{35}** In support of his sufficiency argument, Defendant challenges only one element—intent to defraud—and we limit our discussion accordingly. In particular, Defendant contends that the State did not prove he intended to deceive or cheat Tafoya or another (that being Hurricane). Because we conclude sufficient evidence supports an intent to defraud Hurricane, we need not and do not address Defendant's alternative contention that the State failed to prove an intent to defraud Tafoya. *See Olguin*, 1995-NMSC-077, ¶ 2 (holding that "due process does not require a guilty verdict to be set aside if an alternative basis of conviction is only factually inadequate to support a conviction").

**{36}** As for his argument pertaining to Hurricane, Defendant contends as an initial matter that the State did not argue at trial that he intended to defraud Hurricane and, as a result, the State cannot now rely on this theory on appeal. While there is legal support for Defendant's contention that the State cannot change its theory of the case in support of an affirmance on appeal, *see State v. Figueroa*, 2020-NMCA-007, ¶ 15, 457 P.3d 983 ("An appellate court cannot affirm a criminal conviction on the basis of a theory not presented to the jury." (alteration, internal quotation marks, and citation omitted)), *cert. denied*, 2019-NMCERT-___, (S-1-SC-37904, Nov. 19, 2019), the State, as already discussed, presented this employment-related theory to the jury. In particular, the State told the jury in opening statements that Defendant used Tafoya's personal identifying information in order to get a job at Hurricane.

**{37}** Turning then to the substance of Defendant's sufficiency challenge, we conclude it is without merit. As discussed in our fundamental error analysis, evidence in the form of the W-4 was presented at trial, which supported the State's theory that Defendant intended to deceive Hurricane to obtain a job. *See Garcia II*, 140 S. Ct. at 805.

Defendant does not argue otherwise; he instead advances only a legal argument why such a theory is insufficient to support his identity theft conviction.

**{38}** Relying on a case from the Kansas Court of Appeals, *City of Liberal v. Vargas*, 24 P.3d 155 (Kan. Ct. App. 2001), Defendant asserts that using a stolen identity to obtain employment is legally insufficient to support an identity theft conviction in the absence of an intent to steal money from the employer or to be compensated for services not actually rendered. *See id.* at 157. Although *Vargas* contains language supporting Defendant's argument, it is inapposite for a number of reasons. First, at the time *Vargas* was decided, Kansas defined identity theft as an " 'intent to defraud for economic benefit,' " *id.* at 156 (quoting Kan. Stat. Ann. § 21-4018 (repealed July 1, 2011)), and, consequently, the question before that court was whether securing employment qualified as an "economic benefit."[8] *Vargas*, 24 P.3d at 156. Second, the cited language is dicta; *Vargas*'s actual holding that insufficient evidence supported the defendant's conviction for identity theft was based on the fact that there was no evidence the defendant had appropriated a real person's identity. *Id.* at 157. Finally, the Kansas Court of Appeals has subsequently disavowed the foregoing dicta in *Vargas*, holding that evidence of a defendant's use of another's personal identifying information to obtain a job is sufficient to support a conviction for identity theft in Kansas. *See State v. Meza*, 165 P.3d 298, 301 (Kan. Ct. App. 2007). Several other courts in jurisdictions with identity theft statutes similar to that of Kansas have come to like conclusions. *See, e.g.*, *People v. Campos*, 2015 COA 47, ¶¶ 7, 15-19, 351 P.3d 553 (discussing cases and affirming conviction because "employment is a 'thing of value' under [Colorado's] identity theft statute"); *People v. Montoya*, 868 N.E.2d 389, 394-95 (Ill. App. Ct. 2007) (affirming conviction because the defendant " 'fraudulently obtained' both money and services as a result of her unauthorized use of [another person's] name and social security number" to obtain a job); *State v. Ramirez*, 2001 WI App 158, ¶ 7, 246 Wis. 2d 802, 633 N.W.2d 656 (affirming conviction because the "economic benefits that flowed from . . . employment . . . were things of value within the meaning of" Wisconsin's identity theft statute).

**{39}** For these reasons, we reject Defendant's sufficiency argument dependent upon *Vargas*. Defendant having made no other argument that the evidence adduced at trial was insufficient to establish his intent to deceive Hurricane, we conclude sufficient evidence supports his conviction for identity theft and retrial is not barred.

## III. Speedy Trial

**{40}** We review Defendant's claim that the district court erred in denying his motion to dismiss on speedy trial grounds because retrial would be prohibited were Defendant to prevail on this issue. *See State v. Flores*, 2015-NMCA-081, ¶ 37, 355 P.3d 81 (reversing convictions because of a speedy trial violation and remanding with instructions to dismiss the charges). "The right of the accused to a speedy trial is guaranteed by both the Sixth Amendment of the United States Constitution and Article

---

8Such a requirement is notably absent from the New Mexico identity theft statute. *See* § 30-16-24.1(A) (requiring, in general, an "intent to defraud").

II, Section 14 of the New Mexico Constitution."[9] *Spearman*, 2012-NMSC-023, ¶ 16. In determining whether a defendant has been deprived of the right to a speedy trial, we analyze the four factors set out by the United States Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972): "(1) the length of delay in bringing the case to trial, (2) the reasons for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice to the defendant caused by the delay." *State v. Serros*, 2016-NMSC-008, ¶ 5, 366 P.3d 1121. In analyzing the *Barker* factors, "we give deference to the district court's factual findings, but we review the weighing and the balancing of the *Barker* factors de novo." *Spearman*, 2012-NMSC-023, ¶ 19 (alterations, internal quotation marks, and citation omitted).

## A.      Length of Delay

{41}    "The first factor, length of delay, is both the threshold question in the speedy trial analysis and a factor to be weighed with the other three *Barker* factors." *State v. Ochoa*, 2017-NMSC-031, ¶ 12, 406 P.3d 505. We agree with the parties that this was a simple case and that the total length of delay from the date of arrest (in April 2014) to trial (in October 2015) was just over eighteen months—six months beyond the twelve-month presumptively prejudicial period. *See, e.g.*, *State v. Garza*, 2009-NMSC-038, ¶¶ 2, 23, 146 N.M. 499, 212 P.3d 387 (deeming twelve months of delay in a simple case the threshold at which further inquiry into the *Barker* factors is warranted). We agree with the State that this relatively short period of delay weighs slightly, not heavily, against it. *See State v. Wilson*, 2010-NMCA-018, ¶ 29, 147 N.M. 706, 228 P.3d 490 ("We cannot say that the extended time of five months . . . requires us to weigh the length of delay factor against the [s]tate more than slightly.").

## B.      Reasons for Delay

{42}    "Closely related to length of delay is the reason the government assigns to justify the delay[,]" with "different weights [being] assigned to different reasons for the delay." *Garza*, 2009-NMSC-038, ¶ 25 (internal quotation marks and citation omitted). Turning to the first period of delay, we observe that Defendant did not file any demand for a speedy trial until eleven months after his arrest. The State contends, both below and now on appeal, that during this period, the parties agreed the trial in this case would be delayed until an older criminal case against Defendant was resolved. Defendant takes the contrary view that no such agreement existed. After hearing argument from counsel at the hearing on Defendant's speedy trial motion and considering the record, the district court could reasonably have found the existence of such an agreement. In light of this, we do not weigh this eleven-month delay against the State.[10] *See State v. Moreno*, 2010-NMCA-044, ¶ 28, 148 N.M. 253, 233 P.3d 782 (agreeing "with the

---

9Defendant raises his speedy trial claim under both the federal and New Mexico Constitutions. But because he does not assert that New Mexico's speedy trial guarantee should be interpreted any differently from the Sixth Amendment's guarantee, and our courts have not done so in the past, we treat both protections as the same here. *State v. Spearman*, 2012-NMSC-023, ¶ 16 n.1, 283 P.3d 272.
10Even if there was no agreement, and, consequently, some or all of this period of delay weighed against the State, Defendant's speedy trial claim would nevertheless still fail under the remainder of the *Barker* factors.

general principle that where a defendant causes or contributes to the delay, or consents to the delay, he may not complain of a denial of the right to a speedy trial" (alteration, internal quotation marks, and citation omitted)).

**{43}** The rest of the delay was occasioned by the State's requested continuances of trial settings in March 2015, June 2015, July 2015, and September 2015—all of which Defendant opposed. The first motion to continue was based on the unavailability of Tafoya, whose attendance the State did not secure because of the apparent agreement to try Defendant's older case first, which was set for trial the same day. The second motion also was based on the unavailability of Tafoya, who could not attend due to lack of childcare. The third motion was based on the unavailability of the investigating officer. And the final motion was based on, among other things, the likelihood the case would not go to trial because it was scheduled as a back-up case. All the continuances, then, were a result of the unavailability of witnesses or negligent or administrative delay and, consequently, do not weigh heavily against the State, if at all. *See Garza*, 2009-NMSC-038, ¶¶ 26-28 (noting that a missing witness is a valid, neutral reason for delay, while negligence on the part of the state is not weighed heavily when the delay is not protracted).

**{44}** In sum, only a few months of the delay, none of which the State caused intentionally or in bad faith, can be attributed to the State. We accordingly weigh this factor only slightly against the State. *See id.* ¶ 30 ("[B]ecause the delay was negligent but not protracted, this factor weighs only slightly in [the d]efendant's favor.").

## C.    Assertion of the Right

**{45}** As for the assertion of the right, "we assess the timing of the defendant's assertion and the manner in which the right was asserted." *Id.* ¶ 32. Defendant filed a request for a speedy trial in March 2015, shortly after the first continuance was granted. He also opposed all the State's requested continuances and filed his motion to dismiss for violation of his right to a speedy trial one week before trial. From this, it appears Defendant made a genuine attempt to have the case tried, at least from March 2015 onward. But the strength of Defendant's assertion is somewhat dampened by the fact that Defendant did not assert his speedy trial right until nearly one year after being arrested. In light of this, we weigh this factor in Defendant's favor, although not heavily. *See State v. Brown*, 2017-NMCA-046, ¶ 32, 396 P.3d 171 (determining that, where the defendant made numerous assertions but also contributed to some of the delay, the fourth *Barker* factor weighed in the defendant's favor but not strongly); *see also Spearman*, 2012-NMSC-023, ¶¶ 32-33 (determining that, where the defendant asserted his right in an early motion, opposed at least one requested continuance, and filed a motion to dismiss, "[the d]efendant did not aggressively assert the right, [although] he did not acquiesce to the delay" (alterations and internal quotation marks omitted)).

## D.    Prejudice

**{46}** We turn next to the last *Barker* factor, prejudice to Defendant caused by the delay. *See Garza*, 2009-NMSC-038, ¶ 12 ("The heart of the right to a speedy trial is preventing prejudice to the accused."). "Ordinarily, a defendant bears the burden of proof on this factor by showing 'particularized prejudice' when claiming a speedy trial violation." *Serros*, 2016-NMSC-008, ¶ 86. To determine if Defendant was prejudiced, we consider whether there was (1) undue and oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) impairment of the defense. *See Garza*, 2009-NMSC-038, ¶ 12.

**{47}** For several reasons, we conclude Defendant suffered little, if any, prejudice. First, although Defendant was in custody for fifteen months between his arrest and his release three months prior to trial, he was in custody on other charges at the time of his arrest in this case and continued to be held on those charges during the vast majority of his pretrial incarceration in this case. Given this, Defendant has not demonstrated oppressive pretrial incarceration. *See State v. Urban*, 2004-NMSC-007, ¶ 17, 135 N.M. 279, 87 P.3d 1061 (holding that the defendant did not suffer oppressive pretrial incarceration because he was incarcerated on other charges during the relevant time period).

**{48}** Second, at the hearing on his motion to dismiss, Defendant testified generally that it had been "hard" for him to "keep going" with his life because he was unable to get a job. Such non-specific testimony is insufficient to distinguish Defendant's anxiety, concern, and disruption of life from that befalling any individual awaiting trial on criminal charges. *See Garza*, 2009-NMSC-038, ¶ 35 ("[W]e weigh this factor in the defendant's favor only where . . . the anxiety suffered is undue.").

**{49}** Third, although Defendant testified that he had been unable to contact two potential alibi witnesses while he was incarcerated, he did not explain why his attorney could not contact the potential witnesses, or whether the delay caused him to lose contact with these witnesses. Moreover, Defendant admitted that the testimony of these witnesses was cumulative of the testimony offered by other, available defense witnesses. Under the circumstances, Defendant failed to demonstrate an impairment to his defense. *See id.* ¶ 36 ("[T]he defendant must state with particularity what exculpatory testimony would have been offered, and the defendant must also present evidence that the delay caused the witness's unavailability." (alterations, internal quotation marks, and citation omitted)).

## E.    Balancing the Factors

**{50}** In weighing the speedy trial factors, we recognize no single consideration is dispositive. *See, e.g.*, *Barker*, 407 U.S. at 533 (explaining "they are related factors and must be considered together with such other circumstances as may be relevant"). Here, Defendant did not suffer the type of prejudice required by *Garza*, and the other three *Barker* factors simply do not weigh heavily enough in Defendant's favor to warrant dismissal of the case. *See Garza*, 2009-NMSC-038, ¶ 39 ("[A] defendant must show particularized prejudice [unless] the length of delay and the reasons for the delay weigh

heavily in [the] defendant's favor and [the] defendant has asserted his right and not acquiesced to the delay[.]"). We affirm the denial of Defendant's motion to dismiss for violation of his right to a speedy trial.

## IV.    Remaining Claims

{51}    Defendant raises two additional claims on appeal: (1) he received ineffective assistance of counsel when his attorney did not move to suppress the social security and permanent resident cards seized during a search of his residence, and (2) the district court abused its discretion by admitting a certain exhibit evidencing Defendant's address. Were Defendant to prevail on either of these issues, he would be entitled to no more relief than he already has received. Because of this, we need not and do not address these issues. *See, e.g., State v. Sena*, 2020-NMSC-011, ¶ 4, 470 P.3d 227 ("Because we remand for a new trial, it is not necessary, and we decline to address, whether the district court erred in [its admission of certain evidence]."); *State v. Stanley*, 2001-NMSC-037, ¶ 44, 131 N.M. 368, 37 P.3d 85 ("In light of the reversal of the [other] issues, we do not review [the d]efendant's ineffective assistance of counsel claim[.]").

## CONCLUSION

{52}    We reverse Defendant's conviction for identity theft and remand for proceedings consistent with this opinion.

{53}    IT IS SO ORDERED.

**JENNIFER L. ATTREP, Judge**

**WE CONCUR:**

**KRISTINA BOGARDUS, Judge**

**SHAMMARA H. HENDERSON, Judge**